| | |
|---|---|
| **WO** | JDN |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Rodney Cable,  )  No. CV 08-1618-PHX-JAT (MHB)
)
   Plaintiff,  )
)  **ORDER**
vs.  )
)
Dora B. Schriro, et al.,  )
)
   Defendants.  )
)

Plaintiff Rodney Cable brought this civil rights action under 42 U.S.C. § 1983 against three officials from the Arizona Department of Corrections (ADC): former ADC Director Schriro; Facility Health Administrator Terry Allred; and Dr. Karen Barcklay (Doc. #1). Before the Court is Defendants' Motion for Summary Judgment (Doc. #34), to which Plaintiff did not respond.

The Court will grant Defendants' motion and terminate the action.

**I.   Background**

Plaintiff's claim arose during his confinement at the Arizona State Prison Complex-Cheyenne Unit in Yuma, Arizona (Doc. #1 at 1).[1] In Count I of his Complaint, he alleged that Defendants were deliberately indifferent to his serious medical needs when they failed to provide him with hernia surgery for over fifteen months and then delayed surgery for another six weeks after a specialist informed Plaintiff that surgery was needed immediately

---

[1] Plaintiff is no longer incarcerated (see Doc. #37, Notice of Change of Address).

(id. at 3-3A). Plaintiff further alleged that after he received the surgery, Defendants' post-operative care was so deficient that he needed a second surgery (id.). And he claimed that Defendants failed to provide him with prescribed pain medication (id.).[2]

The Court screened the Complaint and ordered Defendants to respond (Doc. #3). Defendants filed their Answer (Doc. #8), and discovery commenced (Doc. #9). Defendants then submitted their Motion for Summary Judgment (Doc. #34).

## II. Motion for Summary Judgment

### A. Defendants' Contentions

#### 1. Facts

Defendants submit a separate Statement of Facts (DSOF) (Doc. #35), which is supported by the declarations of each Defendant and copies of Plaintiff's medical records and inmate grievances (id., Exs. B-D, Attachs.). DSOF sets out the following facts:

On April 1, 2005, Plaintiff submitted a Health Needs Request (HNR) complaining that he had a painful protruding hernia (DSOF ¶ 15). On April 6, Barcklay examined Plaintiff, who said that he had a hernia and wanted it fixed (id. ¶ 16). Barcklay was unable to palpate a hernia. She informed Plaintiff that there was weakness noted and nothing to fix at that time; however, she issued a Special Needs Order (SNO) for a hernia aid and advised him to follow-up with an HNR if needed (id.).

On October 13, 2005, Plaintiff submitted a HNR complaining that he had a hernia causing him extreme discomfort (id. ¶ 17). On October 19, Barcklay examined Plaintiff and noted that the exam was the same as before; she found that there was weakness in the left inguinal canal but no actual hernia (id. ¶ 18). She advised Plaintiff to use the hernia aid to prevent progression to a hernia and to submit a follow-up HNR if needed (id.).

On March 26, 2006, Plaintiff submitted another HNR complaining that he suffered pain with his hernia and that it was getting worse (id. ¶ 19). On March 28, Barcklay examined Plaintiff and found a 3 x 3 cm diameter left inguinal hernia that was tender and

---

[2]The Court dismissed Plaintiff's claim in Count II for failure to state a claim (Doc. #3).

- 2 -

non-reducible when Plaintiff stood (id. ¶ 20). She also noted bowel loops in the hernia sac, and found that it was difficult to reduce the hernia when Plaintiff was lying down (id.). They discussed the need to use the hernia aid, and Barcklay submitted an outside consult/request to the medical review board for a general surgery telemed appointment, which begins the process of obtaining an outside consultation with a surgeon (id.). If the medical review committee approves the consult request, the request is forwarded to ADC's Central Office (id. ¶ 22). If the Central Office approves the request, then—upon receipt of the authorization—the local clinical coordinator schedules the outside consultation (id.). Once Barcklay submits the request to the medical review committee, she is no longer directly involved in the process of obtaining a consult (id.).

On April 11, 2006, Plaintiff submitted a HNR complaining about his hernia and inquiring about medical treatment (id. ¶ 23). On April 12, Plaintiff was seen by Dr. Pedersen, a surgeon, by telemed (id. ¶ 24). Pedersen recommended repair for Plaintiff's modest left inguinal hernia (id.). He stated that surgery, which he referred to as "elective," was not urgent unless Plaintiff developed more profound constipation or left lower quadrant pain (id.). That same day, ADC physician Scheetz submitted a request for surgery to the medical review committee (id.).

On May 9, 2006, Plaintiff submitted a HNR asking whether his surgery had been approved (id. ¶ 25). The response from Nurse Spencer stated that Plaintiff would be notified if surgery was approved (id.). Plaintiff filed another HNR on May 30, 2006, again inquiring whether surgery had been approved and scheduled (id. ¶ 26). Allred responded to Plaintiff's HNR the next day and informed Plaintiff that surgery was approved and would be performed soon (id. ¶ 27).

On June 7, Pedersen performed surgery on Plaintiff (id. ¶ 28). Two days later, Spencer examined Plaintiff, who stated that he was sore but okay (id. 29). On June 15, Barcklay examined Plaintiff, who stated that he was doing well but remained sore (id. ¶ 30). Barcklay noted slight swelling at the surgery site but no bruising; she advised Plaintiff to follow-up with a HNR if needed (id.).

On July 8, Plaintiff submitted a HNR requesting to see the doctor because his hernia did not appear to be healing correctly (id. ¶ 31). On July 12, Nurse Ayala examined Plaintiff and noted a hard 3 x 5 inch mass under the incision site; she referred Plaintiff to the medical provider (id. ¶ 32). On July 18, Scheetz examined Plaintiff and noted a 5 inch mass in Plaintiff's groin; Scheetz noted that Plaintiff needed a consultation with the surgeon as soon as possible (id. ¶ 33). That same day, Scheetz submitted an outside consult request to the medical review board (id.). The next day, Pedersen examined Plaintiff at St. Mary's Hospital and noted that Plaintiff had a postoperative seroma, which Pedersen drained (id. ¶ 34).[3] Pedersen recommended that if the seroma recurred, Plaintiff should go four to six weeks before draining (id.). Barcklay reviewed Pedersen's report (id.).

On July 22, Plaintiff submitted a HNR complaining that there was swelling and that fluid needed to be drained again (id. ¶ 35). On July 28, Barcklay examined Plaintiff and noted a 2 x 3 bulge with no redness or drainage; they discussed Pedersen's recommendation to wait four to six weeks before draining (id. ¶ 36). Barcklay advised Plaintiff to notify medical if his condition worsened and that same day, she submitted an outside consult to the medical review board requesting a surgery telemed consultation (id.).

Plaintiff submitted an inmate letter on July 31 about the seroma that developed after his hernia surgery and requested that Allred call the surgeon to determine whether Plaintiff needed to return to Tucson or if the seroma could be drained at the prison medical facility (id. ¶ 37).

On August 2, the medical review committee denied the request for outside consultation and recommended that Plaintiff use a hernia aid to try to reduce the seroma (id. ¶ 38). A week later, after the hernia aid did not help, the medical review committee approved the outside consultation (id.).

On August 9, Allred responded to Plaintiff's July 31 inmate letter by informing Plaintiff that he consulted with the provider, recapping Plaintiff's care to date and repeating

---

[3] A seroma is a mass caused by the localized accumulation of serum within a tissue or organ. Stedman's Medical Dictionary seroma (27th ed. 2000).

Pedersen's recommendations, and advising Plaintiff to wait for his telemed appointment (id. ¶ 39).

Plaintiff submitted a HNR on August 15, complaining that his seroma needed to be drained; Barcklay responded that Plaintiff had to wait for the telemed appointment with the surgeon (id. ¶ 40). The telemed appointment was conducted on August 30 (id. ¶ 41). Pedersen noted that the seroma recurred and was the same size as before; he discussed the need to redrain it and again tried to encourage Plaintiff to go four to six weeks before redraining (id.). Pedersen stated that postoperative seromas were not unusual post large-hernia repair, and he recommended that Plaintiff wear a snug-fitting athletic supporter after draining. Also on August 30, Barcklay submitted an outside consult request to the medical review board for a surgery clinic for drainage (id.).

On September 13, Plaintiff submitted a HNR requesting that his seroma be drained; Barcklay responded that surgery had been approved and they were waiting for his appointment (id. ¶ 42). On October 11, Pedersen saw Plaintiff at St. Mary's Hospital and drained the seroma; he advised Plaintiff to wear something to apply pressure for day or two and if the seroma reappeared, wait for it to absorb itself and if it did not, Pedersen would drain it in four to six weeks (id. ¶ 44).

A few days later, on October 16, Plaintiff submitted a HNR requesting to see a doctor for follow-up (id. ¶ 45). October 25, Barcklay examined Plaintiff and noted that the seroma had reformed the same as before; they discussed use of the hernia aid, and Plaintiff stated he did not use it (id.). Barcklay reminded Plaintiff of Pedersen's recommendation to allow the seroma to resolve on its own, to which Plaintiff responded argumentatively (id.). Barcklay advised Plaintiff to follow-up with a HNR if needed (id.).

Plaintiff filed inmate letters on November 16 and 17 complaining about his recurrent seroma (id. ¶ 47). Allred responded to the November 16 inmate by recapping Plaintiff's medical care for his hernia and restating Pedersen's recommendations (id. ¶ 49). On January 8, 2007, Allred responded to the November 17 inmate letter by informing Plaintiff that they were waiting for an appointment date from the provider (id. ¶ 43).

Meanwhile, on December 1, 2006, Plaintiff submitted a HNR stating that the seroma had not been reabsorbed (id. ¶ 50). Nurse Ricci examined Plaintiff a few days later and referred Plaintiff to the provider (id. ¶ 51). On December 6, Barcklay examined Plaintiff and noted the seroma, issued a special needs order for an athletic supporter, advised Plaintiff to use the hernia aid and supporter, and submitted an outside request to the medical review committee for a surgery clinic for drainage (id. ¶ 52).

Pedersen saw Plaintiff on January 17, 2007, and drained the seroma (id. ¶ 55). He advised Plaintiff to apply pressure and massage the area for two or three days and if the seroma recurred, he would see Plaintiff in two to three months for drainage (id.).

On February 8, Plaintiff submitted a HNR about his seroma and its failure to heal (id. ¶ 56). He was seen by Spencer on February 21; Spencer referred him to the medical provider, and Barcklay saw Plaintiff on February 23 (id. ¶¶ 57-58). Barcklay noted that Plaintiff was using the hernia aid but not really doing massage, the seroma was not as large, and a one-month follow-up was ordered (id. ¶ 58). At the next appointment on March 23, Barcklay noted that the seroma was smaller; she cleaned and aspirated it and ordered Plaintiff to use the hernia aid and follow-up in a month (id. ¶ 59).

Plaintiff submitted a HNR on April 2 stating that the seroma recurred; he was seen by Barcklay on April 25 (id. ¶¶ 60-61). Barcklay noted that the seroma was much smaller; she was able to withdraw only some of the fluid, so she submitted an outside request to the medical review board for a pelvic ultrasound (id. ¶ 61). The ultrasound was performed on June 1; the results, received on June 15, were consistent with a recurrence of seroma in the left groin (id. ¶ 62). Barcklay submitted another outside request to the medical review board for a surgical consultation (id. ¶ 64).

Pedersen saw Plaintiff on July 11, 2007, by telemed and noted a persistent left-groin seroma; he recommended a CT scan of the pelvis (id. ¶ 66). That day, an outside consult was submitted to the medical review board for the CT scan (id.). The CT scan was done on July 30, and showed a seroma in the subcutaneous soft tissues (id. ¶ 67). Barcklay reviewed the

radiology report, and on August 22, submitted an outside request to the medical review board for a surgery consultation (id. ¶¶ 67, 69).

Meanwhile, Allred responded to Plaintiff's inmate letters and a grievance about his medical concerns by reciting the medical care Plaintiff received (id. ¶ 71). And on July 23, 2007, Allred met with Plaintiff to discuss his medical concerns (id.).

On September 26, Pedersen examined Plaintiff and noted a possible leak from the seroma; he requested to see Plaintiff in six to twelve weeks (id. ¶ 73). Barcklay reviewed Pedersen's report (id.). On October 3, Plaintiff submitted a HNR request to see Barcklay, who then examined him on October 11 (id. ¶¶ 74, 76). She noted that the seroma was smaller, and they discussed Pedersen's recommendations; Barcklay also submitted an outside request for an in-office surgery clinic (id. ¶ 76). Pedersen saw Plaintiff on November 14; noted a persistent left groin seroma, and requested to see Plaintiff in two to four weeks (id. ¶ 79). That day, Barcklay reviewed Pedersen's report and submitted an outside request for another in-office surgery clinic (id. ¶ 80).

On December 1, 2007, Plaintiff submitted a HNR about his seroma; Barcklay responded that a request for appointment had been submitted (id. ¶ 81). Pedersen saw Plaintiff again on January 23, 2008 at St. Mary's Hospital (id. ¶ 83). He noted that the seroma was slowly resolving and recommended a six-week follow-up (id.). Later that week, Barcklay reviewed Pedersen's report and submitted an outside request for a follow-up in-office surgery clinic (id. ¶ 84). Plaintiff filed another HNR on February 6, asking to see Pedersen; Barcklay responded that an appointment had already been requested (id. ¶ 85).

On March 5, 2008, Pedersen saw Plaintiff and recommended a groin-exploration surgery (id. ¶ 86). On March 11, Barcklay submitted an outside request for surgery (id. ¶ 87). Pedersen performed the surgery on April 17 (id. ¶ 89). Pursuant to Pedersen's instructions, on April 18, Nurse Ende prescribed Plaintiff Hydrocodone (id. ¶ 90). On April 22, Plaintiff submitted a HNR stating that he was worse since the surgery and he had not received his pain medication (id. ¶ 91). Barcklay responded that no pain medication had

been sent from Pedersen but Plaintiff could get ibuprofen; she also noted that a follow-up with Pedersen was to be scheduled (id.).

Plaintiff was seen by Nurse Steere on April 24; it was noted that the surgery site was swollen and protruding but there was no infection or bleeding; Steere prescribed ibuprofen (id.). Also on April 24, Barcklay submitted an outside request for a surgery telemed appointment (id. ¶ 92). Plaintiff was seen again by Nurse Ricci on April 28 and 29, who monitored Plaintiff's swelling (id. ¶¶ 93, 95). Pedersen saw Plaintiff by telemed on April 30; he recommended that he see Plaintiff every two to four weeks in person to drain the seroma (id.). Barcklay reviewed the report, and Scheetz submitted an outside request for an in-office surgery consultation (id.).

On May 27, Plaintiff submitted a HNR stating that the last surgery fixed the ongoing problem and he wanted to be seen by telemed (id. ¶ 98). On June 2, Plaintiff refused to be transported for an in-person visit with Pedersen because he said his seroma had healed (id. ¶ 99).

Plaintiff filed his civil rights action on August 25, 2008 (Doc. #1).

### *2. Legal Arguments*

Defendants seek summary judgment on the grounds that (1) Plaintiff's claims that accrued before August 25, 2006 are barred by the statute of limitations, (2) Defendants were not deliberately indifferent to Plaintiff's medical needs, (3) the Eleventh Amendment bars damages claims against Defendants in their official capacity, and (4) Plaintiff's punitive damages claim is not warranted (Doc. #34).

Defendants contend that under the applicable two-year statute of limitations, Plaintiff's claims that arose before August 25, 2006 are barred (id. at 9).

With respect to liability, Defendants argue that Schriro's only role in this case was the denial of Plaintiff's grievance, which is insufficient to establish liability (id. at 11-12). Defendants note that during the relevant time frame, all health services programs were delegated to the Director of Program Services and the operation of inmate health services was delegated to the Health Services Bureau Administrator (id. at 12). Defendants assert that

Schriro does not have a medical degree and never provided, approved, or denied medical care as those decisions were made by medical staff (id.).

Defendants argue that Allred's responsibilities were administrative and that he was not a licensed medical professional and did not provide care or create policy (id. at 13). They explain that Allred could not make medical decisions or override a provider's course of treatment (id.). Defendants submit that Allred responded appropriately to Plaintiff's inmate letters and grievances and even met with Plaintiff to discuss his concerns (id.). Defendants maintain that Allred's denial of Plaintiff's grievance does not amount to deliberate indifference or create liability (id.).

And as to Barcklay, Defendants argue that over the course of two years, Barcklay examined Plaintiff 12 times and submitted 11 requests for outside consultations (id. at 13-15). Defendants assert that Barcklay followed Pedersen's recommendations as he was the specialist, and that Plaintiff's condition was only resolved by a second surgery (id. at 15). Defendants submit that there is no evidence that Barcklay's treatment caused any injury and that Plaintiff's disagreement as to the proper course of treatment does not give rise to an Eighth Amendment claim (id.).

Defendants conclude by setting forth arguments against punitive damages and damages against them in their official capacity (id. at 15-16).

**B.     Plaintiff's Response**

On October 5, a few days after Defendants filed their summary judgment motion, the Court issued an Order informing Plaintiff of his obligation to respond to the motion (Doc. #36). See Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998). On the same day that this Order was issued, the Court received Plaintiff's Notice of Change of Address, which indicated his move to a residence in Phoenix, Arizona (Doc. #37). The Court resent a copy of the Rand Order to Plaintiff at the Phoenix address (see Docket entry dated October 7, 2009). To date, Plaintiff has not filed a response to the summary judgment motion, and the time for responding as expired.

Although there is no response memorandum, Plaintiff's Complaint is verified; therefore, it is treated as an affidavit opposing summary judgment (see Doc. #1 at 5). See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196, 197-98 & n. 1 (9th Cir. 1987). In his pleading, Plaintiff alleges the following facts:

In March 2005, Plaintiff noticed that he had a protrusion in his lower abdomen (Doc. #1 at 3A ¶ 3). On April 1, he submitted a HNR informing medical that he had a hernia that was causing pain and discomfort (id. ¶ 4). About ten days later, Barcklay advised Plaintiff that there was nothing that could be done to repair the hernia (id. ¶ 5).

On October 13, 2005, Plaintiff submitted a HNR complaining that his hernia was progressing in size and he was in constant pain (id. ¶ 6). Barcklay gave Plaintiff a hernia belt to wear and again said that there was nothing that could be done (id.).

On March 26, 2006, Plaintiff submitted a HNR complaining that the hernia was much worse; the belt was not helping; and that whenever he used the toilet, coughed, or lifted anything, he was in intense pain (id. ¶ 7). Barcklay advised Plaintiff that a telemed appointment with a specialist would be scheduled (id.).

On April 11, Plaintiff submitted another HNR complaining that his hernia was causing unbearable pain and he was having difficulty eating; he inquired whether he was going to receive treatment (id. at 3B ¶ 9). Plaintiff was finally seen on April 21 via telemed; the specialist advised Plaintiff that he needed immediate surgery (id. ¶ 10). Despite this recommendation and Plaintiff's serious condition, it took Schriro nearly six weeks to authorize surgery (id. ¶ 11). He had surgery on June 7 at St. Mary's Hospital (id. ¶ 12).

As a direct result of Barcklay's failure to provide prompt access to the specialist, however, Plaintiff developed a seroma (id. ¶ 13). On July 8, Plaintiff submitted a HNR requesting to see the specialist due to swelling, which was worsening and causing pain (id. ¶ 15). Plaintiff was seen on July 19 and rushed to St. Mary's Hospital, where a surgeon drained the seroma (id. at 3C ¶ 16). The surgeon instructed Barcklay that if the seroma returned, it should be drained at least once every two weeks (id.).

1   The seroma returned within a few days but Plaintiff was not taken to the hospital to
2   have it drained until October 11—11 weeks after the initial drainage. Plaintiff did not get
3   it drained again until January 17, 2007—another 14 weeks later (id. ¶ 17). On March 23,
4   Barcklay drained the seroma at the prison medical facility, and on April 17, Barcklay
5   attempted to drain it (id. ¶ 18).

6   Then, on June 1, contrary to the surgeon's instructions, Allred had Plaintiff taken to
7   Yuma Regional Medical Center for an ultrasound of the seroma (id. ¶ 19). The seroma
8   continued to grow larger, and Plaintiff repeatedly filed HNRs and inmate letters complaining
9   about the inadequate medical treatment (id. ¶ 21). Allred's responses were crafted in a
10  manner to minimize his and Barcklay's culpability for failing to comply with the surgeon's
11  instructions on how to treat the seroma (id. at 3D ¶ 22).

12  On July 30, 2007, Plaintiff was again taken to the Yuma Medical Center for an x-ray
13  and MRI (id. ¶ 23). Plaintiff was taken to St. Mary's Hospital where the surgeon drained the
14  seroma on September 25, 2007; November 14, 2007; January 23, 2008; and again on March
15  5 (id. ¶ 24). Barcklay's and Allred's failure to adhere to the surgeon's instructions for
16  treating the seroma ultimately led to Plaintiff undergoing a second surgery on April 16, 2008
17  (id. ¶ 25). Upon his return to prison a few days after this surgery, Plaintiff was not given his
18  prescribed pain medication, nor did he see Barcklay (id. ¶ 26). On April 22, Plaintiff
19  submitted a HNR complaining of swelling and pain and asking for the pain medication that
20  the surgeon prescribed (id. at 3D ¶ 27). Plaintiff did not receive in any pain medication (id.
21  ¶ 28).

22  On May 27, 2008, Plaintiff filed a HNR requesting a consult with the surgeon via
23  telemed because the seroma had finally healed, and he believed that an in-person visit at St.
24  Mary's Hospital was unnecessary (id. ¶ 29). This grievance was apparently disregarded, and
25  the scheduled visit to St. Mary's was not cancelled; Plaintiff therefore signed a refusal since
26  his hernia was healed (id. ¶ 30).

27  Plaintiff alleged that Barcklay's 15-month delay in scheduling Plaintiff to see a
28  specialist placed Plaintiff at a significant risk of imminent harm and caused him to suffer

1 continuous pain (id. at 3F ¶ 32). He further alleged that Barcklay failed to comply with the
2 surgeon's care instructions and the seroma therefore worsened and caused Plaintiff intense
3 pain (id. ¶ 34). Plaintiff argued that Allred and Barcklay failed in their duty to ensure that
4 Plaintiff received timely care, including follow-up treatment for his seroma (id. ¶ 35). And
5 he claimed that Schriro failed to hold subordinates accountable and succumbed to budgetary
6 constraints, which in turn led to Plaintiff receiving deliberately indifferent care (id. at 3G
7 ¶ 37). Plaintiff specifically asserts that Defendants are not entitled to qualified immunity
8 because they violated clearly established constitutional rights that a reasonable person would
9 have recognized (id. ¶ 39).

## III.  Legal Standards

### A.  Summary Judgment

A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). Even where the nonmovant fails to respond to a summary judgment motion, the movant must still affirmatively show the absence of genuine issue of material fact. Martinez v. Stanford, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

If the movant meets its burden with a properly supported motion, the burden then shifts to the nonmovant to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmovant need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions

of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). By affidavit or as otherwise provided by Rule 56, the nonmovant must designate specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076. The nonmovant may not rest upon the pleadings' mere allegations and denials, but must present evidence of specific disputed facts. See Anderson, 477 U.S. at 248.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Id. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw all inferences in the nonmovant's favor. Id. at 255.

**B.     Eighth Amendment**

To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) that the defendant's response was deliberately indifferent. Jett, 439 F.3d at 1096 (citations omitted).

A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (quoting Estelle, 429 U.S. at 104).

To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In the medical context, deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. Jett, 439 F.3d at 1096.

1 Prison officials are deliberately indifferent to a prisoner's serious medical needs if they deny, 2 delay, or intentionally interfere with medical treatment. Wood v. Housewright, 900 F.2d 3 1332, 1334 (9th Cir. 1990). But a delay in providing medical treatment does not constitute 4 an Eighth Amendment violation unless the delay was harmful. Hunt v. Dental Dep't, 865 5 F.2d 198, 200 (9th Cir. 1989) (citing Shapley v. Nevada Bd. of State Prison Comm'rs, 766 6 F.2d 404, 407 (9th Cir. 1985) (per curiam)).

7 "[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to 8 establish deliberate indifference.'" Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) 9 (citation omitted). Therefore, to prevail on a claim involving choices between alternative 10 courses of treatment, a prisoner must show that the course of treatment the doctors chose was 11 medically unacceptable in light of the circumstances and that it was chosen in conscious 12 disregard of an excessive risk to prisoner's health. Jackson v. McIntosh, 90 F.3d 330, 332 13 (9th Cir. 1996).

14 **IV.  Analysis**

15 The Court will first address Defendants' claim that they were not deliberately 16 indifferent to Plaintiff's serious medical need (see Doc. #34 at 10). Defendants make no 17 argument that Plaintiff's condition did not constitute a serious medical need, thereby 18 satisfying the first prong of the deliberate indifference test. Estelle, 429 U.S. at 104. Thus, 19 the summary judgment analysis turns on whether Defendants' response to Plaintiff's serious 20 medical need was deliberately indifferent. See Jett, 439 F.3d at 1096.

21 **A.  Medical Care**

22 The first question in the deliberate-indifference analysis is whether the delay in 23 surgery and the post-surgery treatment Plaintiff received implicates the Eighth Amendment. 24 The record shows that Plaintiff first requested care related to his hernia on April 1, 2005, and 25 that Barcklay examined Plaintiff within days of his request (Doc. #35, DSOF ¶¶ 15-16). 26 Plaintiff alleged in his pleading that Barcklay told him that nothing could be done; however, 27 Defendants' submit Plaintiff's medical record of the April 6 exam, which documents that 28 Barcklay found weakness on the left side but no actual hernia, and she nonetheless issued a

Special Needs Order for a hernia aid (id., Ex. D, Barcklay Decl. ¶ 4, Attach. 2). The medical records further show that after Plaintiff's April 2005 exam, he did not request medical treatment again for six months, in October 2005, at which time he was seen and it was determined that no hernia had progressed (id., DSOF ¶¶ 17-18). Then Plaintiff did not seek treatment until March 2006, at which time Barcklay submitted a request for a surgery consult (id. ¶ 19-20), which led to surgery a few months later (id. ¶ 28). The medical records reflect that Barcklay's evaluations of Plaintiff pre-surgery were substantive, with physical examinations and discussions about his condition and the use of hernia aids (id. ¶¶ 15-20, 23-24). And the evidence confirms that upon Pedersen's initial recommendation for surgery, a request for approval from the medical review board was immediately submitted (id. ¶ 24). The time from Pedersen's surgery recommendation (April 12, 2006) until the surgery (June 7, 2006) was just short of two months (id. 24, 28).

Plaintiff alleges that this delay placed him in imminent danger of suffering from a hernia eruption (Doc. #1 at 3B ¶ 11); however, he submits no medical evidence to support a conclusion that the short delay caused him harm or that Defendants were responsible for the scheduling delay. See Shapley, 766 F.2d at 407 ("mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference"). Nor does Plaintiff produce any evidence to show that a delay in surgery led to the subsequent seroma problems post-surgery. Indeed, Defendants' evidence includes Pedersen's report that it is not unusual for seromas to occur after hernia repairs (Doc. #35, Ex. D, Attach. 28). On this record, the treatment Plaintiff received pre-surgery and the short delay in obtaining surgery do not raise Eighth Amendment concerns.

With respect Plaintiff's post-operative care, the medical records demonstrate that Plaintiff was seen by medical personnel 10 times from June-December 2006 (id., DSOF ¶¶ 28, 30, 32-34, 36, 41, 44, 46, 51-52), and approximately once a month though 2007 (id. ¶¶ 55, 57-59, 61-62, 66-67, 73, 75, 79). During these numerous appointments, medical personnel monitored Plaintiff's condition, periodically drained the recurring seroma, discussed Plaintiff's diet, encouraged the use of hernia aids and massage, and performed

MRI and CT scans (see e.g., ¶¶ 55, 58, 62, 67). As noted, according to Pedersen, the existence of a seroma following hernia surgery is not unusual, and Plaintiff produces no evidence to show that his recurring seroma was in any way caused by the care he received post-surgery. See Hutchinson v. United States, 838 F.2d 390, 393 (9th Cir. 1988) (in medical cases where the plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish deliberate indifference).

Plaintiff argues that Pedersen recommended that the seroma be drained every two weeks and Defendants were deliberately indifferent in failing to adhere to that recommendation. But in his written recommendation, Pedersen wrote "I do not like to tap seromas more often than 2 weeks and would try to encourage the patient to go out 4 to 6 weeks before tapping" (Doc. #35, Ex. D, Attach. 21 (July 19, 2006 report)). Thus, the initial recommendation was to wait 4 to 6 weeks to drain the seroma. Although the medical records show that from mid-2006 to early 2007, Plaintiff waited 2-4 months between seroma tapping (see Doc. #35, DSOF ¶¶ 34, 44, 55, 59), Plaintiff's own allegations reflect that from November 2007 to March 2008, the seroma was tapped every six weeks (Doc. #1 at 3D ¶ 24). Regardless, Plaintiff's disagreement with medical personnel's decision to extend the period of time between tapping, absent any evidence of resulting harm, is insufficient to demonstrate deliberate indifference. See Toguchi, 391 F.3d at 1058.

In short, Plaintiff submits no medical evidence showing that the delay in obtaining his hernia surgery caused him further injury. See Hutchinson, 838 F.2d at 393. And Plaintiff falls well short of demonstrating that the course of treatment he received before or after surgery was medically unacceptable in light of the circumstances and that it was chosen in conscious disregard of a risk to his health. See Jackson, 90 F.3d at 332.

**B.  Liability**

*1. Barcklay*

As to the alleged failure to provide pain medication after the second surgery in April 2008, Plaintiff's prison medical records indeed show that pursuant to Pedersen's notes, Plaintiff was prescribed Hydrocodone upon his return to the prison facility (Doc. #35, Ex.

D, Attach. 75).[4] Defendants' evidence reflects that when Plaintiff submitted a HNR about his prescribed pain medication, Barcklay responded that "[n]o 'pain meds' were sent from your surgeon," and instead provided Plaintiff with ibuprofen (id., Attach. 76). Neither Defendants' motion nor Barcklay's declaration address this clear failure to provide Plaintiff with prescribed medication.

Deliberate indifference may be shown where prison officials ignore the instructions of a prisoner's treating physician or surgeon. See Wakefield v. Thompson, 177 F.3d 1160, 1165 (9th Cir. 1999) (Eighth Amendment implicated where prison officials failed to provide prisoner with medication the prison doctor had prescribed). Whether failure to provide prescribed medication violates the Eighth Amendment turns on the facts of the particular situation. Johnson v. Schwarzenegger, 2010 WL 582677, at *2 (9th Cir. Feb. 19, 2010) (unpublished).[5] As set forth in Estelle, officials act with deliberate indifference only if they intentionally interfere with prescribed treatment. 429 U.S. at 104-105.

Here, there is no evidence to suggest that Barcklay intentionally interfered with Pedersen's prescribed treatment when she did not provide the Hydrocodone. "[A]n inadvertent failure to provide adequate medical care" by itself does not amount to a violation. Estelle, 429 U.S. at 105. Plaintiff's general and conclusory allegations that Barcklay acted with "reckless disregard" to Plaintiff's health (Doc. #1 at 3), without more, are insufficient to establish deliberate indifference. See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988). To the extent that Barcklay may have been negligent in failing to review Plaintiff's April 18, 2008 medical record, which would have notified her to the Hydrocodone prescription, negligence does not constitute deliberate indifference. Wood, 900 F.2d at 1334 (proof of medical malpractice or even gross negligence does not establish a constitutional violation). Further, because Barcklay's conduct was an "isolated occurrence" in the overall course of

---

[4] Hydrocodone is a derivative of codeine that is used as an analgesic, i.e. painkiller. Stedman's Medical Dictionary hydrocodone (27th ed. 2000).

[5] Case cited pursuant to Ninth Circuit Rule 36-3, which provides for citations to unpublished dispositions issued on or after January 1, 2007.

treatment for Plaintiff, it militates against a finding of deliberate indifference. Id. (to amount to deliberate indifference, the particular facts must indicate more than isolated occurrences of neglect); McGuckin, 974 F.2d at 1060.

More importantly, Plaintiff fails to produce any medical evidence that (1) the failure to provide the Hydrocodone resulted in further serious injury or (2) the Hydrocodone would have significantly reduced his level of pain beyond the relief provided by ibuprofen. See Hutchison, 838 F.2d at 394. And the Court notes that the Hydrocodone was to alleviate pain as opposed to medication to treat a life-threatening or psychiatric condition, which raises more serious concerns. See Johnson, 2010 WL 582677, at *2 ("[f]ailure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need"); Wakefield, 177 F.3d at 1162 (concerning denial of a psychotropic medication used to manage the prisoner-plaintiff's delusional disorder).

In sum, there exists no genuine issue of material fact that Barclay was deliberately indifferent in denying Plaintiff prescribed pain medication.

### *2. Schriro and Allred*

To establish deliberate indifference, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. McGuckin, 974 F.2d at 1060; Shapley, 766 F.2d at 407. "The prisoner must set forth specific facts as to each individual defendant's deliberate indifference." Leer, 844 F.2d at 634.

Neither Schriro nor Allred are licensed medical professionals, and neither Defendant had any part in providing medical care or prescribing medical treatment to Plaintiff (Doc. #33, Ex. B, Schriro Decl. ¶¶ 5; Ex. C, Allred Decl. ¶¶ 4-5). See May v. Enomoto, 633 F.2d 164, 167 (9th Cir. 1980) (the prison director "could not be charged with responsibility for the neglect or delay, if any, of his subordinates in the absence of his direction or participation therein"). Further, Schriro's and Allred's roles in denying Plaintiff's grievances are insufficient to establish liability. See Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999) (where a defendant's only involvement in the allegedly unconstitutional conduct is the denial of an administrative grievance, the failure to intervene to remedy alleged unlawful behavior

- 18 -

does not amount to active unconstitutional conduct for the purposes of § 1983). Consequently, there is no dispute of material fact concerning Schriro's and Allred's liability for deliberate indifference.

For the above reasons, Defendants' Motion for Summary Judgment will be granted, and the Court need not address Defendants' arguments concerning the statute of limitations or damages.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. #34).

(2) Defendants' Motion for Summary Judgment (Doc. #34) is **granted**.

(4) The Clerk of Court must dismiss this action and enter judgment accordingly.

DATED this 27th day of April, 2010.

_____
James A. Teilborg
United States District Judge